**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| UNITED STATES OF AMERICA,     ) | |
| )                                                | |
| Plaintiff,        ) | |
| )                                                | |
| vs.                                              ) | Cr. No. 10-396-RB |
| )                                                | |
| BRENDA AGUILAR,                 ) | |
| )                                                | |
| Defendant.    ) | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW
AND ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS**

THIS MATTER came before the Court on Defendant Brenda Aguilar's Motion to Suppress Physical Evidence and Statements. (Doc. 43.)  A hearing was held on May 17–18, 2010.  Having fully considered the evidence and the arguments for and against, the Court hereby GRANTS Defendant's motion.

**FINDINGS OF FACT**

1. At the suppression hearing, the government presented the testimony of five officers who were present at the Stevens Motel on February 28, 2008 and participated in the search and seizure.  The Court found them to be experienced officers and their testimony credible.

2. Mr. Christopher Hollis, who is Defendant's fiancé and was present during the seizure, also testified.  The Court did not find his testimony credible.

3. On February 28, 2008, Officer William Norwood of the Hagerman Police Department was in Carlsbad, New Mexico working a case involving a stolen travel trailer.  The Hagerman Police Department had received a tip that the trailer was in a particular neighborhood near Eighth Street in Carlsbad, and Officer Norwood had been ordered to find and recover the

trailer. Officer Norwood was accompanied by Detective Scott London of the Artesia Police Department because Officer Norwood was not commissioned in Eddy County, and his authority as a law enforcement officer was limited to Chaves County.

4. The travel trailer had been stolen from Hagerman, New Mexico in November 2007 and was allegedly in the possession of Defendant Brenda Aguilar and her boyfriend, Mr. Hollis.

5. Officer Norwood and Detective London had been searching the neighborhood unsuccessfully for approximately two hours when they received information that Ms. Aguilar was staying at the nearby Stevens Motel and allegedly selling drugs out of her motel room.

6. Officer Norwood and Detective London went to the motel where they discovered Ms. Aguilar's vehicle in the parking lot; they ran the license plate to confirm this.

7. Based on the information they received regarding possible drug activity, Detective London contacted Commander Edmondson of the Pecos Valley Drug Task Force and asked him to come to the Stevens Motel to assist. This was just after noon on February 28, 2008.

8. While waiting for the Drug Task Force, Officer Norwood and Detective London spoke with housekeeping and discovered that Ms. Aguilar was staying in room 420.

9. Shortly thereafter, Commander Edmondson arrived. Detective London indicated to him that Ms. Aguilar was in room 420 and informed him that there were complaints of high traffic in and out of the room, indicating drug activity. Officer Norwood then informed Commander Edmondson that Ms. Aguilar possibly had an outstanding warrant for her arrest.

10. While it was true that Ms. Aguilar had an outstanding arrest warrant in Chaves County, where Officer Norwood would have had authority to execute the warrant, the officers had no authority to execute the warrant in Eddy County, as the warrant had been issued by the

       Roswell Municipal Court and was non-extraditable from the surrounding counties. In fact, the warrant was only executable in Chaves County, and this type of warrant is never entered into the National Crime Information Center (NCIC) database. (Doc. 68.)[1] Consequently, any information about the warrant must have come from Officer Norwood or someone in Chaves County. Officer Norwood stated, however, that he never attempted to confirm the warrant, and that he only "had information that there was possibly a warrant for Ms. Aguilar." (Hr'g Tr. vol. I, 48:13–14.) Commander Edmondson indicated that, during the detention and search, "[t]hey were trying to confirm there was a warrant," (Hr'g Tr. vol. I, 14:22–15:6) and that, after the search, the officers learned the warrant was only executable in Chavez County. (Hr'g Tr. vol. I, 27:14–19.)

11.    After speaking with Detective London and Officer Norwood, Commander Edmondson went to Defendant's room and began knocking on the door. Commander Edmondson was dressed in plain clothes, but he had his badge displayed on his belt. Officer Norwood was in uniform, and Detective London was wearing a suit. They were standing behind and to the side of Commander Edmondson; therefore, anyone looking out the motel room window would have been able to see the three officers and understood they were law enforcement.

12.    Agents Vazquez and Gonzales, who were part of the Pecos Valley Drug Task Force, were dressed in plain clothes. They arrived while Commander Edmondson was knocking on the door and stood nearby to assist; however, it is not clear they were visible from the motel room window.

---

1. Defendant intended to call Ms. Lupe Fuentes, Court Clerk for the Roswell Municipal Court to testify regarding warrants issued by the Municipal Court; however, the hearing was continued to a second day, and there was not time for her to testify during the first day. So that she would not have to make the long car trip back for the second day of the hearing, the parties agreed to enter a "Stipulation of Facts" (Doc. 68) regarding her proposed testimony.

13. Initially, Commander Edmondson did not receive an answer, and after a brief pause, he continued to knock. A few moments later, Ms. Aguilar pulled back the curtain on the window to the left side of the motel room door, looked out, and saw the officers; however, she did not open the door. Commander Edmondson therefore knocked again, a bit louder this time. A short time later, Mr. Hollis came to the window and looked out, but he did not answer the door either. Then, with his gun "out" behind his back, Commander Edmondson identified himself as a police officer and ordered Mr. Hollis and Ms. Aguilar to "come to the door" or to "open the door." (Hr'g Tr. vol. I, 21:17–23, 22:21, 23:3–24, 81:10–21, 107:8–13; Hr'g Tr. vol. II, 16:18–19.) Still, no one answered. Commander Edmondson therefore continued knocking on the door, yelling "Police Department," and ordering Defendant to "come to the door" or to "open the door." Finally, after approximately two to three minutes, Mr. Hollis opened the door.

14. When Mr. Hollis opened the door, Commander Edmondson indicated they were investigating complaints of high traffic in and out of the motel room, and they suspected there may be drugs, guns, or other contraband in the room. Mr. Hollis responded that they did not have anything. Commander Edmondson then asked if he could come in. Mr. Hollis consented.

15. Upon entering the motel room, Commander Edmondson observed Brenda Aguilar sitting on the bed with her back to the headboard and typing on a laptop. Agent Vazquez and Detective London also entered the room at this time to "secure" it, meaning that they strategically placed themselves to monitor the movements of the occupants and ensure that no possible evidence could be destroyed. (Hr'g Tr. vol. I, 87:7–23.) Agent Gonzales and Officer Norwood stood just outside the room, but close enough to be visible and to observe

what was going on inside.

16. Commander Edmondson advised Ms. Aguilar why they were there—reports of high traffic in and out of her motel room and an outstanding warrant—and asked if he could search the room. Both Ms. Aguilar and Mr. Hollis consented.

17. Before searching, Commander Edmondson read Ms. Aguilar her Miranda rights and asked Agent Vazquez to escort Mr. Hollis out of the room.

18. During the suppression hearing, both Commander Edmondson and Detective London indicated that, at this point, Ms. Aguilar had been seized. On direct examination, Commander Edmondson stated, "I knew that she had a warrant, so she wasn't going to be free to go in case she made any statements" (Hr'g Tr. vol. I, 14:22–23); and on cross examination, he indicated that Ms. Aguilar was under "investigatory detention" and "[s]he wasn't going to be free to leave." (Hr'g Tr. vol. I, 29:24–30:2.) Detective London added, "I'm certain that he did notify her of the warrant, at which point we would all assume she is not free to leave." (Hr'g Tr. vol. I, 84:5–7.)

19. Commander Edmondson began his search with Ms. Aguilar's purse, which was lying by the side of the bed where Ms. Aguilar was sitting. In the purse he found a small amount of methamphetamine, $2,600 in cash, plastic baggies, ledgers, and other items related to the trafficking of drugs.

20. Commander Edmondson asked Detective London to handcuff Ms. Aguilar, who was then removed from the bed and placed in handcuffs.

21. Commander Edmondson asked if there was a gun in the room, and Ms. Aguilar indicated that there was a gun in a case next to where she had been sitting on the bed. Commander Edmondson opened the case and found a .380 caliber pistol.


22. Commander Edmondson then asked Agent Vazquez to escort Ms. Aguilar out of the room.

23. Continuing the search, Commander Edmondson found another handgun between the mattresses of the bed where Ms. Aguilar had been sitting and seized other drug-related items.

24. Agents Vazquez and Gonzales took Ms. Aguilar to their vehicle to interview her. Mr. Hollis was standing outside the motel room, and they wanted to separate the two of them so that they could not overhear each other.

25. Before the interrogation, Agent Vazquez asked Ms. Aguilar if she had been informed of and understood her *Miranda* rights. She indicated the Commander Edmondson had mirandized her and that she understood those rights. (Hr'g Tr. vol. I, 100:14–25; Hr'g Tr. vol. II, 22:5–8.)

26. Ms. Aguilar then made several incriminating statements, indicating that she sold and did drugs and that the guns belonged to her.

27. Agent Vazquez asked her if she would be interested in cooperating with the Task Force in its investigations. Ms. Aguilar was "real hesitant" at first, but eventually she indicated that she would cooperate. (Hr'g Tr. vol. I, 102:21–103:23; Hr'g Tr. vol. II, 26:6.)

28. Agent Gonzales asked for consent to search Ms. Aguilar's vehicle. Ms. Aguilar consented. The officers found a loaded 9mm magazine and a box of ammunition in the trunk.

29. At some point during the interrogation, Ms. Aguilar indicated she needed to use the bathroom. Detective Debra London, a female officer, was summoned to escort Ms. Aguilar to the bathroom, and she seized additional methamphetamine that Ms. Aguilar was carrying on her person.

30. When the searches and the interrogation concluded, the officers released Ms. Aguilar from custody with the understanding she was now a "cooperator." (Hr'g Tr. vol. I, 28:3–5.)

**CONCLUSIONS OF LAW**

1. The Fourth Amendment prohibits unreasonable searches and seizures. U.S. CONST. AMEND. IV. In order for the Fourth Amendment to apply, a person must have a reasonable expectation of privacy in the area to be searched. *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). In *Minnesota v. Olson*, 495 U.S. 91, 98–99 (1990), the U.S. Supreme Court found that overnight visitors have a reasonable expectation of privacy in their temporary shelter. The government does not contest that Ms. Aguilar had a reasonable expectation of privacy in the motel room; therefore, the Court will treat the room as her domicile for Fourth Amendment purposes. *See United States v. Reeves*, 524 F.3d 1161, 1165 (10th Cir. 2008) ("[Defendant] was inside his [motel] room at the time he opened his door and we analyze this encounter as occurring within his home.").

2. Where the Fourth Amendment applies, a warrant is generally required before an officer may search or seize a person or her property. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). This requirement is, of course, subject to "a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). For instance, "a search conducted pursuant to a valid consent is constitutionally permissible." *Schneckloth*, 412 U.S. at 222; *see also Reeves*, 524 F.3d at 1166 ("Consensual encounters do not implicate the Fourth Amendment.").

3. "[T]o determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 439 (1991); *see also United States v. Houston*, 21 F.3d 1035, 1037 (10th Cir. 1994) ("No

single factor dictates whether a seizure has occurred.").

4. When the validity of a search or seizure is based on consent, the government bears the burden of showing that the consent "was freely and voluntarily given." *Florida v. Royer*, 460 U.S. 491, 497 (1983); *see also Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (1971); *United States v. Pena-Sarabia*, 297 F.3d 983, 986 (10th Cir. 2002). "This burden cannot be discharged by showing acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968). The government must show that, under the totality of the circumstances, Defendant's consent was voluntarily and freely given. *United States v. Drayton*, 536 U.S. 194, 207 (2002).

5. The government argues that Defendant and Mr. Hollis gave the officers consent to enter and search their room; therefore, there was no Fourth Amendment violation. *See Schneckloth*, 412 U.S. at 219; *Reeves*, 524 F.3d at 1166 ("Consensual encounters do not implicate the Fourth Amendment."). Specifically, the government asserts the officers conducted a "knock and talk," which constitutes a "consensual encounter and therefore does not contravene the Fourth Amendment." *United States v. Cruz-Mendez*, 467 F.3d 1260, 1264 (10th Cir. 2006).

6. "Knock and talks" are a common police tactic used by officers to make an investigatory inquiry when they do not have a search warrant, but suspect criminal activity in a suspect's home. Through the "knock and talk," the officer attempts to confirm or dispel his suspicions of illegal activity and possibly obtain the occupant's consent to enter and search the home. A "knock and talk," however, must always be consensual: police cannot create a show of force, make demands on occupants, or otherwise create the impression that the occupants compliance is required. *See United States v. Gomez-Moreno*, 479 F.3d 350, 355 (5th Cir. 2007). "When officers demand entry into a home without a warrant, they have gone beyond

the reasonable 'knock and talk' strategy of investigation." *Id.* at 355–56.

7.  The Government analogizes the facts in this case to the Tenth Circuit case, *Cruz-Mendez*, 467 F.3d 1260. In *Cruz-Mendez*, officers conducted a "knock and talk" after receiving a call from a concerned resident indicating that Mr. Cruz-Mendez, who had been deported and had several previous narcotics convictions, had been seen at his girlfriend's apartment. Three officers visited the apartment to investigate. One officer was in uniform, but the other two were dressed in civilian clothes. Without drawing their weapons or making any demands that the people inside the apartment "open up," the officers knocked on Ms. Armenta's door. After knocking on the door, the officers asked if they could enter the apartment because of the cold weather, and Ms. Armenta consented. The Tenth Circuit found that the entry into the apartment did not violate the Fourth Amendment because, based upon the totality of the circumstances, Ms. Armenta had freely and voluntarily consented. *Id.* at 1265.

8.  Defendant analogizes the facts in this case to the Tenth Circuit case, *Reeves*, 524 F.3d 1161. In that case, several police officers went to Mr. Reeves motel room at around 3:00 a.m. without a warrant to question him about a sexual assault that had occurred earlier that evening. The officers knocked on the window and door to Mr. Reeve's room with their flashlights for approximately twenty minutes while yelling and identifying themselves as police officers. Mr. Reeves eventually came to the door and stepped out of the room; at which point, the officers observed that he was wearing a gun holster and took him into custody. The Tenth Circuit found "[t]he officers' conduct outside [his] motel room would [have led] a reasonable person to believe he was not free to ignore the officers." *Id.* at 1168.

9.  The Court concludes that the presence of multiple officers, their identification of themselves as police, their repeated demands that Defendant and Mr. Hollis "come to the door" or "open

the door," and the nearly continuous knocking for two to three minutes would have overcome the free will of a reasonable person. Looking out the window twice to assess the forces arrayed against them, Defendant and Mr. Hollis observed several officers who were refusing to give any ground or abandon their attempts to gain access to the motel room and whose demands became progressively more emphatic. Considering the totality of the circumstances, the Court concludes Defendant's free will was overborne. *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (finding "the threatening presence of several officers . . . or the use of language or tone of voice indicating that compliance with the officer's request might be compelled" are indicative of a seizure); *United States v. Hernandez-Chaparro*, 357 Fed. Appx. 165, 167 (10th Cir. 2009) (yelling, declaring oneself a police officer, or pounding loudly on a door for a long period of time indicate a seizure); *Reeves*, 524 F.3d at 1167 ("Opening the door to one's home is not voluntary if ordered to do so under color of authority."); *United States v. Flowers*, 336 F.3d 1222, 1226 n. 2 (10th Cir. 2003) (finding defendant was seized in his home when several officers showed up at his door at night, identified themselves as police, and told him in a firm tone to open the door); *United States v. Jerez*, 108 F.3d 684, 691–93 (7th Cir. 1997) (knocking on a motel room door for three minutes in the middle of the night while declaring themselves police officers constituted a seizure); *United States v. Conner*, 127 F.3d 663, 665–66 (8th Cir. 1997) (concluding that when four officers knocked on defendants' motel door three times, identified themselves as police, and demanded that the defendants "open up," this constituted a seizure).

10. Once Defendant and Mr. Hollis answered the door due to a direct order by Commander Edmondson acting under color of authority, the Fourth Amendment was violated. *See*

*Reeves*, 524 F.3d at 1167 n. 4 & 5; *Flowers*, 336 at 1227; *United States v. Mowatt*, 513 F.3d 395, 399–400 (4th Cir. 2008) ("It is well established that a search occurs for Fourth Amendment purposes 'when officers gain visual or physical access to a . . . room after an occupant opens the door not voluntarily, but in response to a demand under color of authority.'") In *Reeves*, the Tenth Circuit determined that *Payton v. New York*, 445 U.S. 573 (1980) must apply to "all warrantless seizures in the home." 524 F.3d at 1167.

> If we were to hold otherwise, it would allow a seizure in the home when only reasonable suspicion exists, yet prohibit a seizure in the home when an officer has probable cause to arrest, but no exigent circumstances. It cannot be the case that *Payton's* 'firm line at the entrance to the house' offers less protection to individuals for whom probable cause to arrest does not exist.

*Id.* (quoting *Payton*, 445 U.S. at 576).

11. In its memoranda (Doc. 50, p. 5), the government stated that it anticipated a "straightforward application of relevant law" and that the testimony at the suppression hearing would distinguish this case from *Reeves*. The Court does not agree; instead, it concludes that the officers' behavior was coercive and that Mr. Hollis and Defendant only opened the door to the motel room because they were "ordered to do so under color of authority." Consequently, Defendant was seized inside her home in violation of the Fourth Amendment. *Id.* at 1167.

12. Having concluded that the officers unlawfully seized Defendant, the Court now considers whether Commander Edmondson's subsequent requests to enter the room and to search removed the taint of the initial Fourth Amendment violation and transformed the seizure into a consensual encounter. "When a consensual search is preceded by a Fourth Amendment violation, as in this case, the government must prove not only the voluntariness of the consent under the totality of the circumstances, but the government must also establish a

        break in the causal connection between the illegality and the evidence thereby obtained." *United States v. Melendez-Garcia*, 28 F.3d 1046, 1053 (10th Cir. 1994) (internal citations and quotations omitted). "This is a heavy burden." *United States v. Fox*, 600 F.3d 1253, 1259 (10th Cir. 2010).

13.    To determine whether the taint of the earlier unlawful seizure has dissipated, the Court must analyze the factors articulated by the Supreme Court in *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975): "(1) the temporal proximity between the police illegality and the consent to search; (2) the presence of intervening circumstances; and particularly (3) the purpose and flagrancy of the official misconduct." *Melendez-Garcia*, 28 F.3d at 1054.

14.    When Mr. Hollis opened the door, Commander Edmondson identified himself and asked if he could enter. Mr. Hollis consented. Only a matter of seconds passed between the initial violation and Commander Edmondson's request; therefore, the Court concludes that the taint of the initial violation was not removed. *See Fox*, 600 F.3d at 1260 ("consent is not in itself an intervening event which could remove the taint of the prior illegal seizure").

15.    After Commander Edmondson entered the room, he asked for consent to search. There is no indication of any intervening circumstances that served to remove the taint of the initial Fourth Amendment violation. In fact, Commander Edmondson's statement that they had a warrant, the officers' "securing" of the room, and the recital of *Miranda* rights to Ms. Aguilar further confirms this was not a consensual encounter and indicates a continuity between the original illegality and the discovery of evidence. Accordingly, the Court concludes that there was no "break in the causal connection" between the initial seizure and Commander Edmondson's request to search. *Melendez-Garcia*, 28 F.3d at 1053.

16.    With regard to the final factor—the flagrancy of the official misconduct—the government

      argues that under *United States v. Herring*, application of the exclusionary rule is not appropriate in the case at hand because it would not result in any appreciable deterrence of the officers' unlawful behavior. 129 S. Ct. 695, 700 (2009) ("The fact that a Fourth Amendment violation occurred—i.e., that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies."). "As we said in *Leon*, 'an assessment of the flagrancy of the police misconduct constitutes an important step in the calculus' of applying the exclusionary rule." *Id.* at 701 (quoting *United States v. Leon*, 468 U.S. 897, 911 (1984)). In *Herring*, officers reasonably relied on mistaken information concerning a warrant provided to them by the county's warrant clerk. *Id.* at 698. The Supreme Court concluded that "when police mistakes are the result of negligence . . . , rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not pay its way." *Id.* at 704 (internal quotations omitted).

17. The government does not argue, however, that the officers acted negligently upon a reasonable, but mistaken belief that Ms. Aguilar had a valid warrant for her arrest. In its memoranda and at the suppression hearing, the government relied solely on its theory that this was a consensual "knock and talk." (Doc. 50; Hr'g Tr. vol. II, 183:17–22.) Additionally, the facts presented at the suppression hearing do not support a finding of good faith or negligent mistake by the officers. The government and the officers' did not attempt to make a case for negligent mistake and were satisfied to leave many of facts concerning the warrant uncertain; therefore, the Court will not attempt to divine the circumstances surrounding the warrant or their potential implications. Accordingly, the Court does not believe the officers' actions were "based on reasonable but mistaken assumptions." *Herring*, 129 S. Ct. at 699. Where an officer executes an arrest based solely on another officer's statement that there is

possibly an outstanding warrant from another county, without first verifying that the warrant exists or is valid or extraditable, the officer's conduct is not reasonable and is "sufficiently deliberate that exclusion can meaningfully deter it." *Id.* at 702; *see also Leon*, 468 U.S. at 922–23 (establishing a good faith exception to the exclusionary rule when law enforcement officers conduct a search with the objectively reasonable belief that the search is supported by a valid warrant). In conclusion, *Herring* can be distinguished on the facts, and the government failed to argue for or justify application of the good faith exception.

18. "[T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct . . . ." *Herring*, 129 S. Ct. at 702. In its summation, the government argued that Commander Edmondson became nervous and said, "Police open up," or "Come to the door." (Hr'g Tr. vol. II, 184:3–5.) While the officers may have been nervous or anxious, this does not indicate that their actions were the result of mistake or negligence. In *Reeves*, the Tenth Circuit clearly stated that it is a violation of the Fourth Amendment for officers to go to the door of one's domicile and order the person to open the door under color of authority. 524 F.3d at 1167. Under *Illinois v. Krull*, "evidence should be suppressed 'only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.' " 480 U.S. 340, 348–49 (1987); *see also Fox*, 600 F.3d at 1261 ("purposeful and flagrant misconduct is generally found where . . . the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless" (internal quotations omitted)). Accordingly, the Court concludes that the officers' conduct was unlawful, and the officers can be properly charged with having knowledge of the unconstitutionality of their conduct.

19. The fact that the officers "secured" the room following the initial seizure, told Ms. Aguilar she had a warrant for her arrest, and then recited her *Miranda* rights indicates the police conduct was purposeful and flagrant and weighs against finding that the taint was purged. Having unlawfully seized Defendant, the officers did not reverse course, but continued with their unlawful, authoritative, and coercive behavior. The officers did not inform Ms. Aguilar that she was free to refuse consent or otherwise attempt to remove the taint of the unlawful seizure; instead, they continued on in their investigation with a "quality of purposefulness" to seize Defendant and search the room for contraband. *Fox*, 600 F.3d at 1262 (quoting *United States v. McSwain*, 29 F.3d 558, 563 (10th Cir. 1994). Therefore, the Court concludes that the exclusionary rule applies, and any evidence from the motel room must be suppressed as fruit of the poisonous tree.

20. Next, the Court considers whether Ms. Aguilar's custodial statements to Agents Vazquez and Gonzales must be suppressed. Defendant challenges the admissibility of these statements, asserting that they must be suppressed as fruit of the poisonous tree under *Wong Sun v. United States*, 371 U.S. 471 (1963). The government argues that application of the exclusionary rule with regard to Defendant's statements is not warranted in the case at hand because the *Miranda* warnings removed any taint of the unlawful seizure. *Miranda* warnings alone, however, are not sufficient to make a later confession the product of free will and to break the causal connection between the illegal arrest and the inculpatory statements. *Brown v. Illinois*, 422 U.S. at 602. Indeed, when a statement is obtained pursuant to an unlawful seizure, suppression is generally required, unless the government can show that the taint of the original Fourth Amendment violation has dissipated. *See Kaupp v. Texas*, 538 U.S. 626, 632 (2003) (citing *Wong Sun*, 371 U.S. at 486). Again, the

Court must consider the factors set forth in *Brown v. Illinois*, 422 U.S. at 604–05.

21. In the case at hand, very little time elapsed between the unlawful seizure and the statements, such that intervening events could be said to relieve the taint of the unlawful seizure. *See Wong Sun*, 371 U.S. at 491 (finding that taint had been dissipated when defendant "returned voluntarily several days later to make statement"). Ms. Aguilar was removed from the motel room where the seizure had taken place to be interviewed; however, this interrogation was part of the same continuous and uninterrupted chain of events. There was some testimony at the suppression hearing that Defendant had agreed to become a "cooperator" and assist the Pecos Valley Drug Task Force in investigations by making controlled buys; however, this was proposed by Agent Vazquez, not Defendant. In fact, Agent Vazquez testified that she was "real hesitant" about the idea at first, but eventually agreed. (Hr'g Tr. vol. I, 102:21–103:1.) Consequently, the Court is not convinced that this showed "an intervening independent act of a free will." *Wong Sun*, 371 U.S. at 486. With regard to the last factor, the Court already concluded that the conduct in the case at hand was "sufficiently deliberate that exclusion can meaningfully deter it." *Herring*, 129 S. Ct. at 702. Therefore, the Court concludes that the exclusionary rule applies, and Ms. Aguilar's statements must be suppressed as fruit of the poisonous tree.

22. Finally, the Court considers whether evidence seized from Ms. Aguilar's car and person should be suppressed. Once again, turning to the factors in *Brown v. Illinois*, 422 U.S. at 603–04, the Court concludes there was not significant attenuation or intervening circumstances to remove the taint of the original violation, and the officers' conduct was sufficiently flagrant and purposeful to warrant application of the exclusionary rule; therefore, any evidence seized from the vehicle and Ms. Aguilar must be suppressed.

**ORDER**

THIS MATTER came before the Court on Defendant's Motion to Suppress Physical Evidence and Statements (Doc. 43) obtained as a result of the search and seizure of herself, her motel room, and her automobile on February 28, 2008. The Court concludes that the officers unlawfully seized Defendant in her domicile in violation of the Fourth Amendment. Neither Commander Edmondson's requests to enter the room and to search, nor his recital of *Miranda* rights, were sufficient to remove the taint of the Fourth Amendment violation; therefore, the Court finds that the exclusionary rule applies, and any evidence or statements obtained must be suppressed as fruit of the poisonous tree.

**WHEREFORE,**

**IT IS HEREBY ORDERED** that Defendant's Motion to Suppress (Doc. 43) is **GRANTED**.

_____
ROBERT BRACK
U.S. DISTRICT COURT JUDGE